FILED
5/31/16 3:42 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Case No. 14-20155-GLT |
| **BRENT HARBER** and **ELIZABETH ANN HARBER,** | Chapter 7 |
| Debtors. | Related to Dkt. No. 47 |
| **JEFFREY J. SIKIRICA,** chapter 7 trustee, | |
| Movant, | |
| v. | |
| **BRENT HARBER** and **ELIZABETH ANN HARBER,** | |
| Respondents. | |

Jeffrey J. Sikirica, Esq., Chapter 7 Trustee

Glen R. Bartifay, Esq., Attorney for the Debtors

## MEMORANDUM OPINION

Before the Court is the *Motion to Compel Turnover of Property of the Estate* (the "Turnover Motion") filed by the chapter 7 trustee, Jeffrey J. Sikirica ("Trustee"). A response in opposition was filed by Brent and Elizabeth Ann Harber. Because the Trustee has not carried his burden of proof, the Turnover Motion is **DENIED**.

## Background[1]

Mrs. Harber underwent two hip replacement surgeries. The first occurred on her left hip in 2007, and was followed by a replacement of the right hip in 2008.[2] In both procedures, the surgeon implanted products manufactured by DePuy Orthopaedics, Inc. ("DePuy").

Three years later, Mrs. Harber received a letter from the Allegheny General Hospital Department of Orthopaedic Surgery advising her that a "small number of patients with the hip implant you received have experienced problems that required additional care and potentially further treatment . . ."[3] Shortly after receiving this letter, the Harbers were contacted by the law firm of Beasly, Allen, Crow, Methvin, Portis & Miles, P.C. ("Beasly") for the purpose of representing them in a personal injury lawsuit against DePuy. After the Harbers retained the services of the Beasly firm, Mrs. Harber was listed among the plaintiffs in a class action lawsuit filed against DePuy before the United States District Court for the Northern District of Ohio.

The Harbers filed a chapter 7 petition on January 14, 2014, and the Trustee was appointed the following day. Among the personal property listed on Schedule B of the bankruptcy schedules, the Harbers identified the following asset as a contingent and unliquidated claim with a value of $0.00:

---

[1] Unless otherwise noted, this Background information is taken from the joint Stipulated Facts of the parties. [Dkt. No. 76].

[2] There is an inconsistency regarding the dates of the two hip replacements. According to the joint stipulation of the parties, the left hip was replaced in 2007 and the right hip was replaced in 2008. [Dkt. No. 76]. However, according to Mrs. Harber's complaint filed in the Northern District of Ohio, the left hip was replaced on February 15, 2008, and the right hip was replaced on October 25, 2007. Harber v. DePuy Orthopaedics, Inc., case 12-22554 under MDL 10-2197, U.S. District Court for the Northern District of Ohio, Western Division (August 14, 2012). The Court does not consider this inconsistency relevant for the purposes of this motion.

[3] [Dkt. No. 76 at ¶ 4].

2

>  Claim against DePuy Orthopaedics, Inc. for recall of wife's hip replacement; hip replacement is currently operating satisfactorily, no damages as yet

(the "Claim"). On August 27, 2014, the Trustee filed a motion to close the case and exclude the Claim from abandonment. The Harbers did not respond to the motion and the Court thereafter entered a default order on September 18, 2014 which closed the case and excepted the following asset from abandonment:

> A potential claim against DePuy Orthopaedics, Inc. related to the recall of a hip replacement[4]

The Court's order also directed the Harbers and their bankruptcy counsel to immediately notify the Trustee in writing if "any counsel is retained to pursue the claim or if there is any recovery or offer to settle[.]"[5] At no time during the bankruptcy case was Beasly authorized to act as special counsel to either the Harbers or the Trustee.

In November 2014, Beasly advised Mrs. Harber to consider a voluntary dismissal of her District Court claim because she was not required to undergo corrective surgery to either hip. DePuy took the position that plaintiffs who had not undergone corrective surgery were ineligible for compensation, and Beasly feared that if Mrs. Harber proceeded with her claim at that stage, it could be dismissed with prejudice. By voluntarily dismissing the claim without prejudice, Beasly suggested the claim could be refiled in the event revision surgery became necessary in the future.

Shortly thereafter, on November 26, 2014, Mrs. Harber learned that metal had entered her bloodstream as a result of metal-on-metal contact involving the replacement

---

[4] [Dkt. No. 39].

[5] Id.

3

hardware on her left hip. She was advised that immediate revision of the left hip was required. Prior to this time, Mrs. Harber had not experienced any problems with her hip replacements.

Notwithstanding this discovery, Mrs. Harber executed an *Election Form for Non-Revised Plaintiffs* on December 3, 2014 to dismiss her claim in the District Court without prejudice. The District Court dismissed her claim without prejudice on January 9, 2015. At no time did Mrs. Harber seek approval from this Court or the Trustee to dismiss the case.

Revision surgery on Mrs. Harber's left hip occurred on January 15, 2015.

The Trustee moved to reopen the bankruptcy case in May 2015 after the Harbers' bankruptcy counsel informed him of an "offer" to settle the Claim for $142,000.[6] According to the parties, Beasly is willing to refile a complaint on behalf of the Harbers in the District Court action where the DePuy claims are administered. Beasly proposed to settle the Harbers' claims for $142,000, but as of this date, DePuy has not agreed to any payment.

After the bankruptcy case was reopened, the Trustee filed a notice of assets, and creditors were instructed to file proofs of claim.[7] The claims bar date has now passed and only five claims were filed against the bankruptcy estate in an aggregate amount totaling $5,979.57.[8]

The Trustee filed the Turnover Motion to recover any proceeds the Harbers may receive from DePuy. The Harbers oppose this request, contending that the Claim is not property of the estate because Mrs. Harber did not sustain an injury until well after the bankruptcy estate was closed.

---

[6] [Dkt. Nos. 47 and 50 at ¶ 7].

[7] [Dkt. Nos. 54, 55].

[8] See Claim Nos. 1-5.

4

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(E). Venue is proper under 28 U.S.C. § 1409.

## Analysis

Under the Bankruptcy Code, the trustee has the exclusive authority to administer and dispose of property within the bankruptcy estate.[9] Among his responsibilities, a trustee is charged with the duty to "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest[.]"[10] The corresponding duty of a chapter 7 debtor is provided in section 521(a)(4) which mandates the surrender of all estate property to the trustee.

As defined in the Bankruptcy Code, "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case."[11] The concept of estate property "was intended to sweep broadly to include 'all kinds of property, including tangible or intangible property, [and] causes of action[.]'"[12] A cause of action can be considered property of the bankruptcy estate "if the claim existed at the commencement of the filing and the debtor could have asserted the claim on his own behalf under state law."[13] If a cause of action falls within these parameters, the trustee may pursue the claim for the benefit of the bankruptcy

---

[9] 11 U.S.C. §§ 704(a)(1); 541(a)(1).

[10] 11 U.S.C. § 704(a)(1).

[11] 11 U.S.C. § 541(a)(1).

[12] Westmoreland Human Opportunities, Inc. v. Walsh, 246 F.3d 233, 241 (3d Cir. 2001) (citing United States v. Whiting Pools, Inc., 462 U.S. 198, 205 n.9 (1983)); see also In re Fruehauf Trailer Corp., 444 F.3d 203, 211 (3d Cir. 2006) (citing In re Prudential Lines, Inc., 928 F.2d 565, 572 (2d Cir. 1991) (quoting H.R. REP. No. 95-595, 175-76 (1978))).

[13] Bd. of Trs. v. Foodtown, Inc., 296 F.3d 164, 169 n.5 (3d Cir. 2002) (citing Butner v. United States, 440 U.S. 48, 54 (1979)).

estate. Conversely, a claim, cause of action, or other property acquired postpetition is generally not considered property of the estate and may be pursued by the debtor for her own personal benefit.[14]

If the debtor fails to dutifully surrender property of the estate, the trustee can move for turnover of the property under sections 542(a) and 521(a)(4).[15] To support a cause of action for turnover, the bankruptcy trustee has the burden of proof to establish, by a preponderance of the evidence, that (1) the property is available for the trustee's use as property of the estate (or may be exempted by the debtor under section 522); (2) the property is in the possession, custody, or control of another entity; and (3) the property has more than an inconsequential value to the debtor's estate.[16]

In this case, it is undisputed that the Harbers are in control of the property. It is also clear that the potential value of the cause of action is not inconsequential. Based on Beasly's estimates, the claim could settle for as much as $142,000, an amount which is more than sufficient to satisfy all unsecured claims against the bankruptcy estate. It is, however, hotly disputed that the cause of action constitutes property of the estate.

The parties offer two distinct methods to determine whether a cause of action is property of the estate. The Harbers advocate the "accrual approach" whereby the courts examine when a cause of action accrued under applicable state law. Since Mrs. Harber's putative cause of

---

[14]   See 11 U.S.C. §541(a) (defining property of the estate to include those interests existing "as of the commencement of the case," with the exception of certain assets acquired within 180 days of the filing).

[15]   In re Trujillo, 485 B.R. 238, 250 (Bankr. D. Colo. 2012). Specifically in this case, "[t]he Trustee is seeking turnover of the rights to the Claim, including the right to settle the Claim, the right to collect the settlement funds, and the right to distribute the settlement funds pending further order of this Court." [Dkt. No. 47].

[16]   11 U.S.C. § 542(a); Bailey v. Suhar (In re Bailey), 380 B.R. 486, 490 (B.A.P. 6th Cir. 2008); see also 5 COLLIER ON BANKRUPTCY, ¶ 542.02 at 542-8 – 542-9 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2015).

action arose in the Commonwealth of Pennsylvania, the accrual approach requires an examination under Pennsylvania law to determine whether a claim existed as of the petition date. In contrast, the Trustee relies on caselaw from the United States Supreme Court to argue that a cause of action which accrues postpetition may nonetheless be property of the estate if it is "sufficiently rooted" in the debtor's pre-bankruptcy past.[17] The Court will analyze the facts under each approach.

## A.
## The State Law Accrual Approach

Although federal law determines when a debtor's interest in property becomes property of the estate for purposes of section 541, state law usually controls whether the debtor has such an interest.[18] Under Pennsylvania law, "a cause of action *accrues* only when one has the right to institute a suit."[19] As explained by the Pennsylvania Supreme Court, a claim accrues on the date "the plaintiff could have first maintained the action to a successful conclusion" by holding an enforceable claim or right after sustaining an injury that gives rise to damages.[20] In the context of a personal injury tort which sounds in negligence, Pennsylvania law requires that the following elements be present: (1) the existence of a legal duty on the part of the defendant; (2) a breach of that duty by the defendant; (3) a causal connection between the defendant's breach and the resulting injury; and (4) actual damage suffered as a result.[21] Additionally, in a

---

[17] Segal v. Rochelle, 382 U.S. 375, 380, 15 L. Ed. 2d 428, 86 S. Ct. 511 (1966).

[18] Barnhill v. Johnson, 503 U.S. 393, 398, 112 S.Ct. 1386, 1389, 118 L.Ed. 2d 39 (1992); Butner, 440 U.S. at 54-55; In re O'Dowd, 233 F3d 197, 202 (3d Cir. 2000).

[19] Focht v. Focht, 32 A.3d 668, 671 (Pa. 2011) (citing Bell v. Brady, 31 A.2d 547, 549 (Pa. 1943)).

[20] Focht, 32 A.3d at 671 (quoting Fine v. Checcio, 870 A.2d 850, 857 (Pa. 2005)).

[21] Orner v. Mallick, 527 A.2d 521, 523 (Pa. 1987); Morena v. South Hills Health System, 462 A.2d 680, 684 n.5 (Pa. 1983); Smalanskas v. Indian Harbor Ins. Co., 2008 Pa. Dist. & Cnty. Dec. LEXIS 233, at *9 (C.P. Lackawanna Cnty. February 15, 2008) aff'd Smalanskas v. Indian Harbor, 970 A.2d 490 (Pa. Super. Ct. 2009).

tort case such as this, "the injury is done when the act heralding a possible tort inflicts a damage which is physically objective and ascertainable."[22]

It is indisputable that implanting an artificial device in the human body imposes a duty on the medical practitioner and device manufacturer to assure that the device will not cause harm. Thus, in a products liability case, the inquiry focuses on the last two elements, the injury and the actual damages.

While it is relatively easy to ascertain the existence of a personal injury claim when it arises out of a traumatic event, the task is far more difficult if the claim is attributable to a defective surgical implant that functions properly for several years:

> When an individual is exposed to a defective medical product . . . the wrongful act often does not result immediately in an appreciable injury, and the plaintiff will often manifest symptoms of harm only after a period of time. In fact, exposure to a defective medical device does not result in harm in all persons, and at the outset it is impossible to determine which persons will be negatively affected by the device.[23]

In Pennsylvania, a cause of action involving a latent injury will accrue when the plaintiff "discovers, or reasonably should discover, that she has been injured and that her injury has been caused by another party's conduct."[24]

The Trustee argues against the use of the accrual test and instead urges the Court to apply the Third Circuit's holding in the In re Grossman decision to the present facts.[25] The Trustee suggests Grossman is instructive because there, the injured party was exposed to asbestos-containing products prepetition but did not manifest an injury until several years later,

---

[22]   Pounds v. Lehman, 558 A.2d 872, 873 (Pa. Super. Ct. 1989).

[23]   In re Wagner, 530 B.R. 695, 701 (Bankr. E.D. Wisc. 2015).

[24]   Wilson v. el-Daief, 964 A.2d 354, 361-62 (Pa. 2008).

[25]   607 F.3d 114, 125 (3d Cir. 2010) (en banc).

8

leading to the question of whether she held a prepetition claim against the bankrupt vendor who sold the asbestos products. Within this context, the Third Circuit determined that "a 'claim' arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code."[26]

While Grossman may seem analogous, the court's analysis focused exclusively on whether a "claim" existed under section 101(5). Indeed, the Trustee's argument conflates the bankruptcy concepts of "claim" under section 101(5)[27] with "property of the estate" under section 541(a). Grossman and its progeny all deal with claims filed against the debtor which are indubitably claims initiated against the bankruptcy estate. The instant case is quite different, where it is Mrs. Harber asserting a demand for payment from a third party. A recent case before the Fifth Circuit helps clarify this point:

> As should be apparent by now, this line of cases assessing whether a tort claim *asserted against* a reorganized debtor is a dischargeable one that arose prepetition is quite different from the situation we face concerning the timing of a claim *asserted by* the debtor. The former situation turns on the scope of a "claim" subject to discharge, a term defined in section 101(5)(A) of the Bankruptcy Code as a "right to payment" from a debtor, not the definitions of property belonging to the estate set out in sections 541 and 1115. A bankruptcy court explained this key distinction in declining to apply the section 101(5) "claim" analysis to the question whether a cause of action is property belonging to the estate: "the fundamental decisional issue behind the definition of 'claim' is decisively different from the decisional issue that drives the definition of 'property of the estate,'" because the definition of "claim" must be broad enough to "protect the debtor's potential 'fresh start,'" but it is unnecessary that "any and all assets arising from pre-petition conduct be includable in the estate in order to protect the debtor's 'fresh start.'"[28]

---

[26] Id. at 125.

[27] Pursuant to the Bankruptcy Code, the term "claim" means "[a] right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . " 11 U.S.C. § 101(5).

[28] Cantu v. Schmidt (In re Cantu), 784 F.3d 253, 259 (5th Cir. 2015) (citing Swift v. Seidler (In re Swift), 198 B.R. 927, 935-36 (Bankr. W.D. Tex. 1996)).

9

The distinction between the treatment of claims and property of the estate is rooted in Congressional intent. Commenting on the definition of a "claim" in section 101(5), the House Committee stated:

> By this broadest possible definition, and by the use of the term [Claim] throughout Title 11 . . . the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. <u>It permits the broadest possible relief in the bankruptcy court.</u>[29]

The comments on "property of the estate" are, by comparison, more reserved: "[T]he scope of this paragraph is broad. It includes all kinds of property, including tangible or intangible property, causes of action . . . . It is not intended to expand the debtor's rights against others more than they exist at the commencement of the case."[30]

While <u>Grossman</u> is noteworthy because it rejected the use of the "accrual" test for the purposes of determining whether a tort claim exists under section 101(5), the Court finds no proof that the Court of Appeals intended to extend its analysis to the determination of whether a "claim" is property of the estate under section 541(a). To the contrary, the Third Circuit recently confirmed these to be distinct concepts as the determination of estate property "bears little similarity in language or structure to the definition of a 'claim' under § 101(5)."[31] Finding no

---

[29]    H.R. Rep. 95, 95th Congr., 2d Sess., 308-14 (1977).

[30]    <u>Id</u>.

[31]    <u>In re Ruitenberg</u>, 745 F.3d 647, 652 (3d Cir. 2010). The Court also finds no grounds to accept the Trustee's comparison of this case to <u>In re Kane</u>, 628 F.3d 631 (3d Cir. 2010), where the court held that a debtor had a "legal or equitable interest" under section 541(a)(1) on account of an equitable distribution claim that was pending at the time the bankruptcy was filed. Aside from the fact that it was applying New Jersey law instead of Pennsylvania law, the court held that an interest in the equitable distribution existed by virtue of Ms. Kane's marriage and the commencement of divorce proceedings. And unlike interests in tort claims that, under both New Jersey and Pennsylvania law, occur when the party first becomes aware of the injury, the interest in an equitable distribution claim under New Jersey law arises upon the filing of the divorce papers. See <u>Vander Weert v. Vander Weert</u>, 700 A.2d 894, 899 (N.J. App. Ct. 1997) ("[O]nce the divorce complaint is filed, the marital estate is, not technically but in a practical sense, in custodia legis . . . [and] significant equities in the then-distributable marital estate are thereby created[.]").

basis to depart from these well-established distinctions, the Court rejects the Trustee's invitation to rely on the holding of Grossman and will instead consider the facts under applicable state law.

Applying the "long-established" concept of claim accrual under Pennsylvania law,[32] the Court concludes that Mrs. Harber's cause of action accrued on November 26, 2014, the day she first learned that she was injured by the artificial hip replacement. Until that time, Mrs. Harber could not have successfully pursued a cause of action against DePuy because she had not yet shown "physically objective and ascertainable" damages related to the implantation of the medical device. Similarly, the absence of an identifiable injury as of January 14, 2014 prevented the Trustee from derivatively bringing suit as of the date the bankruptcy was filed. Because the elements necessary to establish a viable claim against DePuy were not present as of the petition date, Pennsylvania law dictates that Mrs. Harber's claim did not accrue prepetition and it does not constitute property of the bankruptcy estate under section 541(a).

## B.
## The Rooted in Pre-Bankruptcy Practice Approach

As an alternative approach, the Trustee argues that the Claim and any settlement proceeds should be deemed property of the estate because they are "sufficiently rooted" in the Harbers' prepetition past. In support, the Trustee relies upon the United States Supreme Court's decision in Segal v. Rochelle which determined that after-acquired property can constitute property of the estate when it is "sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupt's ability to make an unencumbered fresh start that it should be regarded as [property of the estate.]"[33] In Segal, the Supreme Court held that a tax loss

---

[32]   See Focht, 32 A.3d at 674.

[33]   Segal, 382 U.S. at 380.

11

carryback for a taxable year that ended postpetition was nonetheless property of the estate because it offset taxes paid on the debtor's prepetition net income.

There can be little doubt that Segal retains vitality after the passage of the Bankruptcy Code in 1977. Courts today ascribe at least some importance to the consideration of whether after-acquired property possesses sufficient roots in prepetition acts, but the manner in which Segal is applied varies greatly.[34]

Some courts give whole-hearted allegiance to Segal by applying its principles without consideration of applicable state law. In In re Webb, the debtor was diagnosed with congestive heart failure prepetition, but only discovered after the petition date that his condition was caused by a particular medication.[35] Pursuant to Segal, the court found that his products liability claim was sufficiently rooted in the prebankruptcy past to be property of the estate.[36]

Other courts have applied Segal to a limited extent. In In re Richards, the court ruled that the debtor's asbestos-related injuries were included in property of the estate, even though the condition was not diagnosed prepetition and thus had not accrued under Michigan law.[37] Unlike this case, the court in Richards had evidence that the onset of the disease and the greater portion of the disease progression occurred prepetition. In other words, it was mere "happenstance" that the diagnosis was rendered postpetition.[38]

---

[34] Jackson v. Novak (In re Jackson), 593 F.3d 171, 176 (2d Cir. 2010); Beaman v. Shearin (In re Shearin), 224 F.3d 346, 351 (4th Cir. 2000); In re Meyers, 616 F.3d 626, 628 (7th Cir. 2010); Longaker v. Boston Scientific Corp., 715 F.3d 658, 662 (8th Cir. 2013); Martinez v. Lincoln Gen. Ins. Co., 417 F. App'x 711, 712 (9th Cir. 2011); Parks v. Dittmar (In re Dittmar), 618 F.3d 1199, 1208 (10th Cir. 2010).

[35] In re Webb, 484 B.R. 501 (Bankr. M.D. Ga. 2012).

[36] See also In re Alvarez, 224 F.3d 1273, 1278-79 (11th Cir. 2000) (holding that a claim is property of the estate regardless of when it accrues, so long as it is adequately linked to the prebankruptcy past).

[37] In re Richards, 249 B.R. 859 (Bankr. E.D. Mich. 2000).

[38] Id. at 861.

12

A blended consideration combining elements of the state law accrual test with the Segal analysis has been the preferred method used by other courts:

> In determining whether a claim is sufficiently developed as of the petition date to constitute property of the debtor for purposes of inclusion or exclusion from the bankruptcy estate, the Court employs what is essentially a three-step process: (1) determine the extent to which the claim is rooted in the prebankruptcy past; (2) determine the extent to which it is entangled with the debtor's ability to make an unencumbered fresh start; and then (3) with both considerations in the balance, determine whether, in view of the purposes of the Bankruptcy Act (now the Bankruptcy Code), the claim is more properly categorized as prepetition property that should come into the estate or a postpetition asset that the Debtor should take free of the claims of prebankruptcy creditors. . . . The extent of a claim's accrual as of the petition date is relevant to determining the extent of its prepetition roots[.][39]

In fourteen cases recently decided in the Eastern District of Pennsylvania, the court noted that the Segal test is applicable, but it also examined the arguments under the accrual test and found several of the claims clearly accrued postpetition.[40]

Yet several courts have simply jettisoned the Segal principles entirely.[41]

This Court finds merit in accepting the blended approach. Through Segal, the bankruptcy estate can retain value from claims that were predominantly rooted in the debtor's prepetition history but, as a matter of happenstance, did not fully accrue until after the petition date. Nevertheless, complete adherence to Segal, without any consideration of the state accrual

---

[39] Casey v. Grasso (In re Riccitelli), 320 B.R. 483 (Bankr. D. Mass. 2005).

[40] Gaito v. A-C Liab. Trust, 542 B.R. 155, 171 (E.D. Pa. 2015). The fourteen cases were heard in the District Court for the Eastern District of Pennsylvania as part of the consolidated asbestos products liability multidistrict litigation. The court applied the accrual test under maritime law and determined that a "cause of action accrues when the injury manifests itself," with the critical inquiry focusing on when the plaintiff had knowledge of the injury and its cause.

[41] Burgess v. Sikes (In re Burgess), 438 F.3d 493, 498 (5th Cir. 2006) (en banc) ("[A]lthough Congress has specifically approved of Segal's result, Segal's 'sufficiently rooted' test did not survive the enactment of the [1978] Bankruptcy Code."); Bracewell v. Kelley (In re Bracewell), 454 F.3d 1234, 1242 (11th Cir. 2006) ("The § 541(a)(1) definition, with its explicit temporal limitation, controls our analysis rather than Segal's test.").

13

test, is inconsistent with Butner and the plain language of section 541(a)(1).[42] Accordingly, the Court finds it necessary to balance both considerations. After applying the Segal test as discussed herein, the Court finds it does not alter the outcome of this case.

Undoubtedly, the Claim has "roots" in Mrs. Harber's prepetition past. The hip replacement device was implanted in Mrs. Harber's left hip seven years prior to the filing of her bankruptcy case. She also received a prepetition notice informing her of the *possibility* that the device could fail. Although it would be expedient to end the inquiry here and find that these circumstances, on their own, satisfy the Segal test, it is not enough that a claim be "rooted" in the pre-bankruptcy past. It must be "sufficiently rooted."[43] To make this determination, the Court must engage in a fact-intensive analysis to assess whether a substantial portion of the claim elements existed prepetition so that it would inequitable to deprive the bankruptcy estate of this asset.

After reviewing the pertinent facts, the Court concludes that the most critical elements of Mrs. Harber's Claim had not taken root as of the time her bankruptcy was filed. She had yet to manifest an injury, and as a result, had not incurred any damages. During the seven-year span between her surgery and the bankruptcy filing, Mrs. Harber did not exhibit any symptoms that would signal a problem with the hip implant, nor is there any evidence to suggest that she purposely delayed any medical evaluation. In 2011, Mrs. Harber was directed to schedule an appointment with her surgeon "as soon as possible" to be re-evaluated. Despite having opportunities to discover a problem in the three years between receipt of the 2011 letter

---

[42] See Butner, 440 U.S. 48.

[43] See Wagner, 530 B.R. at 704; Riccitelli, 320 B.R. at 491.

and the bankruptcy filing, Mrs. Harber did not learn of her condition until she had already received a bankruptcy discharge.[44]

The record is also devoid of any proof that the injury developed slowly over time. Without such evidence, the Court is unable to determine whether the implant failure is triggered by an acute event or represents the gradual deterioration of the device over several years. The distinction is significant because it bears on whether any portion of the injury can be attributed to a time that preceded the bankruptcy filing. Because the Trustee bears the burden of proof on these issues, the absence of any trace of an injury or damage prior to January 2014 prevents the Court from concluding that the cause of action is sufficiently rooted in Mrs. Harber's prepetition past to constitute property of the estate.[45]

## C.
## Judicial Estoppel

Finally, the Trustee contends that the Harbers are judicially estopped from arguing that the Claim is excluded from the estate because they listed it as an asset on Schedule "B" and failed to object when the Trustee excepted it from abandonment. The doctrine of judicial estoppel prevents a party from unfairly shifting positions by prevailing on an argument in one phase of a case and then relying on a contradictory argument to prevail in another.[46] As identified by our Court of Appeals, the elements of judicial estoppel require:

---

[44]  Mrs. Harber's right hip, which was replaced with the same device in 2008, has yet to exhibit any problems.

[45]  Segal also imposes an additional consideration as to whether inclusion of an asset into the estate might impair the debtor's ability to accumulate new wealth or obtain a fresh start. Segal, 382 U.S. at 379. Although not relevant in light of its other findings, the Court finds that the Trustee has satisfied this requirement. If the Claim were deemed property of the estate, more than 90% of the projected net settlement proceeds would be available for Harbers' personal use after funding a 100% distribution to creditors in this case.

[46]  Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA, 779 F.3d 214, 221-22 (3d Cir. 2014) (citing New Hampshire v. Maine, 532 U.S. 742, 749 (2001)).

15

> First, the party to be estopped must have taken two positions that are *irreconcilably inconsistent*. Second, judicial estoppel is unwarranted unless the party *changed his or her position "in bad faith* – i.e., with intent to play fast and loose with the court." Finally, a district court may not employ judicial estoppel unless it is "tailored to address the harm identified" and *no lesser sanction would adequately remedy the damage* done by the litigant's misconduct.[47]

Judicial estoppel may be applied only to avoid a miscarriage of justice when the inconsistent positions are "tantamount to a knowing misrepresentation to or even fraud on the court."[48] To invoke the doctrine, the offending party must have intentionally acted in a manner to gain an unfair advantage.[49] A good faith mistake that is not part of a scheme to mislead the court will not suffice.[50] Because judicial estoppel is a fact-specific and equitable remedy, the application of the doctrine is left to the court's discretion.[51]

Upon filing a bankruptcy petition, debtors must fully disclose all of their interests and property rights in a manner which is adequate, honest, and offered in good faith.[52] This includes a duty to disclose not only pending lawsuits, but any potential or likely causes of action unless they are hypothetical claims that are "so tenuous as to be fanciful."[53] Because accurate self-reporting is the bedrock upon which our bankruptcy system functions, "the importance of

---

[47] Kane, 628 F.3d at 638 (citing Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp., 337 F.3d 314, 319 (3d Cir. 2003)); see also Carlyle, 779 F.3d at 221-22.

[48] Krystal Cadillac, 337 F.3d at 324 (citing Total Petroleum, Inc. v. Davis, 822 F.2d 737, n.6 (8th Cir. 1987)).

[49] Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 362 (3d Cir. 1996) (citing Scarano v. Central R. Co. of N.J., 203 F.2d 510, 513 (3d Cir. 1953)).

[50] Id. (citing Konstantinidis v. Chen, 626 F.2d 933, 939 (D.C. Cir. 1980)).

[51] Kane, 628 F.3d at 637.

[52] Id. at 636; Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F2d 414 (3d Cir. 1988); see also 11 U.S.C. § 521(a)(1)(B); Fed. R. Bankr. P. 1007(b).

[53] Krystal Cadillac, 337 F.3d at 322-23.

full and honest disclosures cannot be overstated."[54] Through the use of accurate and reliable bankruptcy schedules, trustees and other interested parties can avoid "costly investigations to discover the debtor's true financial condition," thereby furthering the goal of a "just, speedy, and inexpensive determination" of every bankruptcy case.[55]

The failure to make an accurate and complete disclosure carries significant consequences, including but not limited to, denial of the bankruptcy discharge, civil sanctions, and even criminal penalties.[56] Moreover, any property of the estate which is unscheduled, including a cause of action, remains property of the estate because it was not administered by the trustee or abandoned by the estate.[57] Although debtors may amend their schedules as a matter of course, they are obligated to invest the time necessary to inventory their assets so that their disclosures can be complete and accurate as of the date of the filing.[58]

The Bankruptcy Code requires full disclosure of property, some of which may not be property of the estate, because "[t]he concept of 'property of the estate' is a fact-based legal conclusion to be decided by the court after the facts are reviewed by interested parties."[59] To the extent debtors are uncertain as to whether an asset is property of the estate, caselaw strongly encourages them to err on the side of overdisclosure.[60] By divulging the existence of the asset

---

[54] Ryan, 81 F.3d at 362.

[55] In re Singh, 433 B.R. 139, 154 (Bankr. E.D. Pa. 2010); see also Fed. R. Bankr. P. 1001.

[56] 11 U.S.C. § 727(a)(4)(A); 18 U.S.C. § 152; Fed. R. Bankr. P. 9011. See also In re Lybrook, 544 B.R. 537 (Bankr. W.D. Pa. 2015) (denying discharge for failure to disclose assets).

[57] 11 U.S.C. § 554(d); Kane, 628 F.3d at 641.

[58] Fed. R. Bankr. P. 1009(a).

[59] In re JZ L.L.C., 371 B.R. 412 (B.A.P. 9th Cir. 2007).

[60] Wagner v. Wagner (In re Wagner), 527 B.R. 416, 430 (B.A.P. 10th Cir. 2015) ("debtors have an uncompromising duty to disclose whatever ownership interest they hold in property, and they must disclose everything, rather than make decisions about what they deem important enough for parties in interest to

and reserving any rights or defenses as to its classification, the debtor can satisfy the duty to disclose and retain the right to exclude the asset from the estate.

In this case, the Harbers have done just that. They disclosed the existence of a potential claim against DePuy, but noted that the hip was "operating satisfactorily" with "no damages as of yet[.]" Under these circumstances, the disclosure of the Claim is not inconsistent with the Harber's argument that the claim is not property of the estate. They allege that no injury occurred as of the petition date, and without any damages, the claim had yet to accrue under Pennsylvania law. For these reasons, the Court finds that the Harbers did not waive their rights to the Claim by disclosing information about it in their bankruptcy schedules.[61]

Judicial estoppel also does not apply because the Harbers did not "persuade" the Court of their position when the Claim was excepted from abandonment. In fact, they took no position whatsoever, allowing the trustee's motion to be approved by default order.

The Court finds these circumstances are distinguishable from those in which judicial estoppel is often invoked to prevent a debtor from pursuing a claim that was not previously disclosed.[62] Here, the Harbers disclosed the asset with a qualification and allowed the Trustee an opportunity to investigate further. To call this an asset of the estate under the guise of judicial estoppel simply because it was disclosed would have a chilling effect beyond the boundaries of this case. It would discourage debtors from freely divulging potential claims or

---

know"); Smith v. Smith, 489 B.R. 875, 894 (Bankr. M.D. Ga. 2013) ("debtors should err on the side of overinclusion"); U.S. Tr. v. Halishak (In re Halishak), 337 B.R. 620 (Bankr. N.D. Ohio 2005) ("[A] showing of good faith . . . will often come down to whether a debtor has abided by this cardinal rule: when in doubt, disclose.") (citing Richardson v. Von Behren (In re Von Behren), 314 B.R. 169, 180 (Bankr. C.D. Ill. 2004)).

[61] In re Cheatham, 309 B.R. 631, 638 (Bankr. M.D. Ala. 2004); In re Stevens, 177 B.R. 619, 620 n.2 (Bankr. E.D. Ark. 1995).

[62] Jethroe v. Omnova Solutions, Inc., 412 F.3d 598, 600 (5th Cir. 2005); In re DeRosa-Grund, 544 B.R. 339, 370 (Bankr. S.D. Tex. 2016); In re Padula, 542 B.R. 753, 760 (Bankr. E.D. Va. 2015).

assets under the fear that they will relinquish all rights to the asset once identified on the schedules. The Court finds that such a result would be anathema to the goal of fostering full and honest disclosures and will dissuade debtors from making qualified disclosures of assets they may contend are not property of the estate.

## Conclusion

The uncontested evidence shows that Mrs. Harber was aware of the potential for a problem with her left hip replacement long before the commencement of her bankruptcy case, but she did not manifest an injury until after the case was closed. Without an actual injury or damages, neither Mrs. Harber nor the Trustee could have successfully pursued a personal injury claim against DePuy under Pennsylvania law on the date the bankruptcy case was filed. The Court also finds that in the absence of any injury or symptoms in the years leading up to the bankruptcy filing, the claim was not "sufficiently rooted" in the pre-bankruptcy past. For these reasons, Mrs. Harber's cause of action for personal injury is not property of the estate. Because the Trustee has not carried his burden of proof, the Turnover Motion will be denied.

An appropriate Order will issue.

Dated: May 31, 2016

GREGORY L. TADDONIO
UNITED STATES BANKRUPTCY JUDGE